We'll hear argument first this morning in Case 18-260, the County of Maui v. the Hawaii Wildlife Fund. Mr. Lin. Mr. Chief Justice, and may it please the Court, this case is not about whether the releases from Maui's underground injection wells should be regulated at all, but how. They are already regulated under several existing State and Federal environmental programs, including the Clean Water Act's non-point source program. But is a Clean Water Act point source permit also required? The question is where the line falls between the Clean Water Act's Federal point source program and its State law non-point source program. And the answer is in the text. The text defines a point source as a discernible, confined, and discrete conveyance, and it thereby makes clear that the trigger for point source permitting is not where a pollutant comes from, but how it reaches navigable waters. An NPDES permit is thus required only when a point source or a series of point sources is the means of delivering pollutants to navigable waters. This understanding is confirmed by the fact that it offers the predictability one would expect in a permitting regime, where regulated entities need to know beforehand whether a permit is required and where, in this particular statute, penalties for noncompliance are so severe. It also maintains an important role for State non-point source programs under the Clean Water Act. Respondents, however, would rewrite the statute to all but eviscerate the line between point and non-point source pollution and radically change the status quo. In this case, they would impose a new Federal permit on wells that have operated the same way for 40 years, during which time EPA expressly rejected calls for NPDES permitting. There are more than 500,000 similar underground injection wells in the country and nearly 6,000 in Hawaii alone. This expansion of the non-point source program and diminution of the — excuse me, this expansion of the point source program and diminution of the non-point source program is not warranted by the text, as is underscored by the fact that Respondents now offer the fourth different reading of the statute to support liability in this case. Roberts. Counsel, I want to make sure I understand what your test is. You say that the — it has to be the means — I guess the point source has to be the means of conveyance to the jurisdictional water? Yes, Your Honor. What does that mean, that if it ever runs into groundwater, it is not the means of conveyance, but the groundwater is? That's correct, Your Honor. What we mean by means of conveyance is that the point source program carries the pollutants to the navigable waters. So the — so any intervention of groundwater removes the jurisdiction of the point source program? That's right, because groundwater is a non-point source. And if the groundwater is, in this case, is diffusely flowing through the ground, and that's what carries the pollutants to the navigable waters — But the well — the well is the source of the pollution. So it would seem that that should be the object of regulation. And it is a conveyance. It is one of two conveyances in this case. But it is a means of delivering, although the groundwater is also a means of delivering. Yes, Your Honor. The wells are a point source, and we don't dispute that. It is a discernible, confined, and discrete conveyance. But not all point sources require point source permits. If that were the case, as Respondents suggest, there would be very, very little, if anything, left for a non-point source regulation. And so our contention, Your Honor, is that if you're reading the statutory text and considering the words addition from any point source, that that contemplates that the point source must be the thing, or point sources must together, as one functional point source, must  be the thing. So if — so if you have a point source under pressure that, you know, just — that doesn't seep out, but kind of shoots the pollutants out, and there, you know, that motion gets to the jurisdictional water, would that be covered? Would that be pollution of the jurisdictional water by that point source? I'm envisioning two different things, one where it's — the pollutant is put in the groundwater and then gradually, you know, seeps into the — into the ocean, and one where it's sort of forcefully expelled, although goes through the groundwater. Your Honor, I think if it still goes through the groundwater, the question under the statute is what is the — what is the conveyance? What is the thing that carries and delivers the pollutants? I think even if it's forcefully put into the groundwater, the groundwater is what's carrying it. Now, I can imagine, Your Honor, scenarios, as we discussed in our brief, where you've got, say, a point source, a pipe that's very close to the water's edge and — and expels the pollutants into the water, the thing that's carrying it, the last conveyance in that factual scenario would be the pipe. The pipe is a discernible confinement. Breyer. What happens if you just take the pipe and you decide what we'll do is we're going to end the pipe 35 feet from the river or from the ocean or something? Now, you know perfectly well that it'll drip down into the ground and it'll be carried out into the navigable water. In your theory, that isn't covered. In that scenario, Your Honor, the land is the conveyance, and that pollution would be regulated under the non-point source. But the conveyance is the groundwater that is underneath the land into which the pipe drips the pollutant. Yes, Your Honor. If it seeps into the ground, then the groundwater is what's carrying and delivering the pollutants. And that scenario would be regulated under the non-point source program. Congress doesn't — Well, then, but what we have is, I take it, an absolute roadmap for people who want to avoid the point source regulation. All we do is we just cut off the — cut off the pipes or whatever 5 feet from the ocean or 5 feet from the navigable stream or 5 feet from — you see, you understand the problem. What I'm looking for in this case is what's a standard that will prevent evasion, which I'm not — I don't see how yours prevents evasion. Your Honor — And at the same time doesn't turn everything into — undercut the groundwater program. If I may, I'd quarrel with your use of the word evasion, because I think what's important to remember is it's a comprehensive scheme. Congress didn't design a — it didn't just put the point source program out into the world on a hope and a prayer that there would be some other regulatory program that would cover the other scenarios, including the one that you're talking about, Justice Breyer. There is a non-point source program. There are laws, including in Hawaii, that would explicitly prohibit the scenario that you're talking about. Hawaii Code 354D — 3354D50, it says that you can't alter the way your — your discharge system is structured without permission from the director of the Hawaii District. But Congress — excuse me, Mr. Lynn — Congress wanted the point source program to do something. The Congress wanted point sources that were discharging pollutants to receive a permit before they did so. And I think what Justice Breyer is saying is that nobody would ever have to go through that process of getting a permit if they knew that they could do something like what Justice Breyer was suggesting, just stop the pipe five feet before the ocean. And I think, Your Honor, the key there is that they knew they could. And could — could is the operative word, because the State law regulations that are in place are significant. And so it's a — it's a yes, Your Honor. There's a clear choice that our reading of the statute offers, which is do you want to be subject to permitting or subject to State law regulation? And State law regulation in many, many States, including Hawaii, doesn't allow the scenario that Justice Breyer is talking about. But that's the problem, isn't it? Because it presumes the State will regulate, and some States don't. So what you're doing is cutting off permitting because you're limiting the word to — or morphing the word to navigable waters and changing it into navigable waters. And that's what Justice Scalia looked at was the plain text and said, into is different than into. And so for us, the question, I believe, is do you read the plain language and does it say from a point source, it's the well, to the ocean? It can be traced. Yes. I think the words are pretty clear. To accept yours, you have to put in the words into. A few answers to that, Your Honor. To accept your meaning, we have to transform in into into. If I may, let me turn first to the question of, you know, States and whether States would regulate. So I think the answer to your question is, could there be States that would simply allow this to be a wild west where there's no regulation of non-point source pollution? And the answer to that is absolutely not. There's a couple reasons why that's not true. First, 1329 of the Clean Water Act requires every State to have a non-point source management program. Second, there are grants and incentives in place, hundreds of millions of dollars a year to encourage States to regulate. And third, there are water quality – there's a water quality backstop in the Clean Water Act. So any water – States are required every two years to identify waters that are impaired, that are not meeting water quality standards. But, Mr. Lin, the question is what this statute means. The question is not whether there's a possible State backstop. The question is what Congress was doing in this statute. And Justice Sotomayor indicated to you that this statute reads pretty firmly. It requires a permit when there's any addition of any pollutants to navigable waters from any point source. So here it's from a point source, which is the well, and it's to navigable waters, which is the ocean, and it's an addition. How does this statute not apply? Your Honor, I think it comes down to what work is from doing in this statute. And from is a preposition, as this Court has recognized for other prepositions like under. It takes its meaning from the words that are around it. And the words here that from is indicating the relationship between our addition and point source. Now, if point source were not a defined term, which is what my friends here urge, and you looked at simply the ordinary meaning of the word source, I think we would have be having a very different discussion. But point source is defined as a conveyance. Kagan. Well, it's defined as more than a conveyance. Conveyance is the umbrella term. But then actually they go further and they say that there are particular things that are point sources, some of which sound like conveyances and some of which, quite frankly, don't. Nobody ever thought that a container sounded like a conveyance. Nobody ever thought that a concentrated animal feeding operation sounded like a conveyance. And most importantly here, nobody really thinks that a well sounds much like a conveyance. But well is specifically defined to be a point source. This is a well. So you can read this provision that I just read you. Any addition of any pollutant to navigable waters from any well. That's what we have here. Your Honor, if I could start with the statutory language. I think the wells as an example is important to address. But I think if you look at the words addition from any point source and you substitute in for point source pipe, which is in the statute and nobody disagrees, is a point source. Addition to a lake, to an ocean, to a river, a navigable water, in addition to a lake of pollutants from a pipe, addition to a lake of sewage water from a pipe. I think, I submit, Your Honor, that the ordinary understanding of that, what one pictures in one's mind is a pipe that is next to the water, not a pipe that is a mile away. And I think that's because you're talking about an addition, which is a verb that has delivery. Yes, Your Honor. Keep going, sorry. It has delivery in it and it's being associated with conveyance, which is the thing that transports, carries and delivers. That sounds like the directly argument that Justice Scalia's opinion rejected. Yes, Your Honor. The Raponos plurality that Justice Scalia wrote, we think it's factually consistent with our reading. We think he was concerned about point source to point source pollution. But as to the textual argument. Why is point source to point source to navigable water covered and point source to non-point source to navigable water not covered? Textually, we think that point source to point source is covered because it is the phrase any point source, not the phrase a point source. That must be the means. And because any includes one or more, you could have more than one point source. And the only way more than one point source can, where all of the point sources are carrying and delivering, is where they are integrated and operating as one point source. If the word from, suppose I think you have a strong argument on the word from, and so too does the opposing side have a strong argument on the ordinary meaning of the word from. What then should we look at to help us decide how to interpret it? Your Honor, as this Court has said many times recently, you have to look at all the other tools of statutory interpretation. And what are the best ones for you? A couple of them. One or two that you think are best for you. If I had to go with two, I would start with structure. The fact that nobody disputes that there should be a point source program and a non-point source program, and that their reading renders the non-point source program by their own admission into a residuum, whereas ours leaves a meaningful role for the non-point source program. The second tool of statutory interpretation, Your Honor, is to look at the context and the other provisions, including the punitive provisions, which, as this Court has recognized, impose civil penalties of more than $50,000 a day. We're talking about a permitting regime. And what would we have expected Congress to have written? Something that requires an after-the-fact analysis of traceability or something that could be determined ahead of time by mere observation that there is here a discernible and confined discrete conveyance that is delivering the pollutants to the water. I need to go get a permit. The term from could be read very broadly to mean that a discharge requires a permit if the pollutant emerges at some point from a point source, and by some means, no matter how remote, some quantity of the pollutant eventually makes its way into the waters of the United States. I take it that interpretation which Respondents once advocated is no longer their position. So what concerns me is whether there is any limiting principle that can be found in the text and is workable and does not lead to absurd results. Your Honor, I think the limiting principle is the means of delivery test, which is that what Congress wanted regulated entities and regulators and courts to look at is how is the pollutant reaching the navigable water? Is it a discernible, confined and discrete conveyance? Now, that is a case-by-case factual determination and there are lines that need to be drawn, but we think in the overwhelming majority of cases it's going to be clear. Your Honor, in terms of whether from could be more broadly read, I think, yes, if the pollutant said, for example, emitted from a point source, that might be a different case. What about the limiting principle that the Respondents now propose, which is that it has to be fairly traceable and there has to be proximate causation and therefore foreseeability? Can that be found in the text and is it workable? Your Honor, we don't think it can be found in the text because we don't read from and we don't think Congress intended from to mean causation. So, one, we don't think it can be found in the text. But that would be a normal way of reading the word from, wouldn't it? In other words, to say, to decide whether something is from something else, you have to look as to whether it's from something else. Your Honor, if I may. Yes. Your Honor, with respect, I think that assumes that a certain kind of word is following from. If you said, for example, Your Honor, this arrived from Miami. Miami is a place of origin. And so, yes, from is indicating the source, the place where that started. But if you said this arrived today from a truck, I posit, Your Honor, I submit that truck is being used as a conveyance there. It's not necessarily the point of origin. Thank you. Thank you, counsel. Mr. Stewart. Mr. Chief Justice, and may it please the Court. The first point I'd like to make about the definition of discharge of a pollutant is that the combination of the words to and from import more than either term in isolation. The statute defines the term discharge of a pollutant to mean any addition of a pollutant to navigable waters or to the ocean from a point source. And, for example, if at my home I pour whiskey from a bottle into a flask, and then I bring the flask to a party at a different location, and I pour whiskey into the punch bowl there, nobody would say that I had added whiskey to the punch from the bottle. It would be true that the whiskey originated in the bottle. Its root was fairly traceable from the bottle to the punch bowl, and it wound up in the bottle, but you wouldn't say it was added to the punch from the bottle. Now, at the other extreme, if I brought the bottle to the party and I poured the whiskey from a few inches above the surface of the punch, and so it traveled through air, or if it traveled through a funnel so it passed over a solid surface, in ordinary parlance we wouldn't say that simply because there was some spatial gap between the bottle and the punch, therefore I didn't add it from the bottle to the punch. In between those two extremes, I don't think that the to and from will get you all the way home. I think the Court needs to look at other provisions of the Clean Water Act to determine what sort of break in the chain will cause the release no longer to be a discharge from the point source to the navigable waters. But the fairly traceable test that the Ninth Circuit adopted just can't be right. It would encompass, if transmuted over to the whiskey example, it would encompass situations where I poured the whiskey from the bottle into the flask, nobody would treat that as addition of the whiskey to the punch from the bottle. Now, with respect to groundwater in particular, the reason that EPA has concluded that groundwater in particular will break the causal chain so that it will no longer be an addition from the point source to the navigable water. Groundwater is really treated in the Clean Water Act as its own thing, and in large part that's because of its distinct physical characteristics. But there's a body of both state and federal law that regulates groundwater specifically in part to protect the drinking water supply, because groundwater is obviously important for that, in part because of potential downstream effects on the quality of navigable water. And in your test, any little bit of groundwater is enough to break the chain? Yes. Now, the hypothetical... Yes, I mean, okay, so two inches. Two inches. But the hypothetical in which somehow the pollutant will be released from a pipe and will travel through two inches of groundwater but won't travel over land doesn't seem realistic. That is, if you imagine a pipe releasing pollutants five feet from the shore and some of... Groundwater and the land. The big difference is that groundwater... The land is not a conveyance. The big difference for purposes of applying the statute is that the land is not the land right next to the bank is not subject to its own body of distinct federal and state regulation in the way that groundwater is. I didn't get the idea of your... What do you say to the hypothetical, which is the pipe goes five feet to the shore? If it goes five feet to the shore and the pollutant travels onto the land, travels across the land and into the water through its own force, it spews out of the pipe or simply through the force of gravity because you're on an incline, we would say that's covered. So if the pipe is on the land and spews onto the land, it's regulated and you need a permit. But if the pipe is underground, it's not and you don't need a permit. You would not need a NIPTES permit because you would not be discharging onto... You would not be discharging to the navigable water. Just to follow up with Justice Breyer's... Justice Breyer said that this was a road map. I guess you said the hypothetical is not realistic, but why isn't it realistic? You've just provided a road map. Put your pipe underground. Well, I think if you were going to do it in the form of a well or do it in the form of injecting pollutants into the groundwater from the surface, you would be subject to this distinct body of regulation. The Clean Water Act requires states that want to implement their own, to administer their own NIPTES programs to regulate disposals into wells. The Safe Drinking Water Act regulates disposals into wells that will affect drinking water quality. So I don't think that the potential for evasion is... So you look at CERCLA or OPA, they're remedial. They're after the fact. This statute is preventative. We want to avoid having to clean it up. That's why we give a permit. And I don't see many of the other statutes you cited in your brief as really addressing that significant problem, which is the preventive issue. And so there is a purpose to the permit. It's the only one that serves that permit, that purpose. I guess I'd say a couple of things. And the first point I would make is to refer to what Mr. Lynn was saying during the earlier part of the argument about nonpoint source pollution and the fact that the Clean Water Act has a robust body of law that encourages states to develop effective programs for combating nonpoint source pollution. But that's one manner of curing the problem. The other is to not exempt groundwater. They exempted a whole series of other means of delivery, but they chose not to exempt groundwater. It's simply illustrative of the fact that the NIPTES program is not intended as a cure-all. It's not intended to deal with every form of activity that might ultimately result in... Well, that's true, Mr. Stewart. And nobody's saying that the federal government can go in and start regulating groundwater as groundwater. And likewise, nobody's saying that it can go in and start regulating nonpoint sources as nonpoint sources. But here, the question is that pollution is coming from a point source, an undisputed point source, and going into the navigable water. And the only question is whether the fact that there's some kind of intermediary between the two, even of, you know, Mr. Lynn says some kind of intermediary, you say ground, underground, whether that makes a difference. The point of this regulation is to go at the source. And the source is still, it's a point source, emitting pollutants. It leaves, I guess what I'm saying is, this leaves a very large sphere of activity that the federal government is still not touching. All it's doing is insisting that when the federal government permitting program applies to point sources, it applies to those point sources regardless of whether it goes two inches underground. I guess the other thing I would say is when we're distinguishing between nonpoint source and point source pollution, we are, at least in general, looking at the means by which the pollutants are conveyed into the waters. And so, for example, if you apply fertilizer to your lawn and a rainstorm comes and the fertilizer is washed into a nearby river, the contraption that you use to apply the fertilizer might fit the statutory definition of a point source. But that would still be treated as nonpoint source pollution. It would be what they refer to sometimes as a sheet flow, unchannelized rainwater that washes into an affluent water. Roberts. Mr. Stewart, Justice Breyer has been trying gamely. I'm sorry. I'm sorry. I just, if you have a reaction to this, if I don't accept, I'm not saying, if I don't accept because I think these two programs are quite different, ground source and point source, different purposes, et cetera, and I'm worried about the evasion or area of, you see, that we talked about first. So it seems to me this case in my mind at the moment is what's the standard for separating the sheep from the goats? And you're basically saying the Ninth Circuit is way too broad and so are they, so we come up with zero, okay, close to zero. Now, the best, I want to try out one thing, if you think, have any reaction to it. If it's regulated under this, if it's the functional equivalent of a direct discharge. Now, the reason that I put that is because that leaves a lot of room for the EPA to write regulations to decide what is the functional equivalent of a direct discharge. And it's narrower than Ninth Circuit. If you want to have a reaction to that, have it. I mean, I guess the reason I'm skeptical of that from our point of view is I think the people, without further guidance from the court, I think the people on the other side of the case in there, amici, would say if it can be shown that the pollutants that were released from the point source ultimately wound up in the navigable waters, then it is the functional equivalent. Breyer. But then what we do is basically it would be up to the EPA, policed by the courts, to see that they've come up with a reasonable decision consistent with the basic objectives of the statute, da, da, da, okay? So we don't know exactly what the right, you see the point. Yes. I guess part of, obviously, if we had rulemaking authority and could flesh that out, it would be helpful. I still have concerns about any approach that could be interpreted as saying if the pollutants make it to the navigable water, then it's covered. Thank you, counsel. Mr. Henkin. Mr. Chief Justice, and may it please the Court, the Clean Water Act prohibits unpermitted additions of pollutants to navigable waters from any point source. This prohibition is not limited to pollutants that flow directly from a point source to navigable waters.  to navigable waters. Rather, all that's required is that the pollutants be from a point source. The Act expressly defines point source to include wells, and the common use of from is to indicate the starting point, cause, or source of something. When you buy groceries, you say they came from the store, not from your car, even though that's the last place they were before they entered your house. Likewise, the millions of gallons of treated sewage entering the Pacific Ocean off West Maui every day come from petitioner's wells under any understanding of the term. For three decades, EPA interpreted the Clean Water Act prohibition this way. In all that time, the parade of horribles petitioner imagines never happened, because applying the prohibition isn't nearly as complicated as petitioner suggests. Consider three scenarios. First, in cases like this one, large quantities of pollutants in navigable waters are easily traced upstream to the point source discharger who should have gotten a permit. Second, it generally is impossible to trace small amounts of pollutants to an individual point source, so the prohibition doesn't apply. Third, when small amounts of pollution are traceable to an individual source, EPA and states can adopt general permits to reduce the regulatory burden. General permits cover entire classes of discharges, like storm water from construction sites and spraying pesticides, and allow the discharges as long as you meet the permit's requirements. Applying the Clean Water Act as written protects our nation's waters and does not impose a significant burden on small discharges. By contrast, as this Court has noted, petitioner's test would enable large-scale polluters to evade the law just by pulling their pipes back a few feet at the water's edge, or, as EPA now agrees, by pointing them underground, as petitioner did here, using the groundwater as a sewer to pollute navigable waters. There's no question that polluters would do exactly that. As discussed in the brief of the State of Maryland, recently a silver mine in New York City canceled its NPDES permit simply by pulling its pipe out of the neighboring creek and sticking it into the groundwater. Roberts. But that's the extreme problem on the other side. But the extreme issue on your side, what is the limiting principle? As far as I understand, once you get the pollutant into groundwater, I mean, groundwater goes into the ocean. So if you get it into groundwater, it's covered by the permit? Mr. Chief Justice, the limiting principles would be traceability and proximate cause. All right. Now, traceability is a technological issue, because we know that the water, including the pollutants, has gotten to whatever it is, the ocean or whatever the jurisdictional water is. It's just a question of how sophisticated the instruments are that can trace it. And I don't know. I don't know exactly how far, how fast the groundwater is going. So that doesn't seem to me to be a significant limitation. And what was the other one that you mentioned? Proximate cause, which comes from the notion of this is the statute regulates behavior that causes something. It's the addition of pollutants to navigable waters from a point source. And from has the meaning of a cause. So it's the same. Well, yeah, proximate cause is notoriously manipulable. Give me an example where you think there would be an intervening cause, where you have an addition to the groundwater. The groundwater eventually makes it to the ocean. But there's an intervening cause. Well, for example, if someone is discharging into an injection well, they've got a Safe Drinking Water Act permit, and that permit told them that this groundwater doesn't go anywhere. It's isolated. No, I'm looking for a limited principle when the groundwater does go to jurisdictional waters. Well, proximate cause cuts off factual causation when it's too attenuated. And so the case, there was a case, Greater Yellowstone Coalition, in which EPA made a finding that where there was evidence that discharges from a mine would enter groundwater, and it would take 60 to, I believe, 400 years to get to a navigable water, and the time that it did that, it would be de minimis of the amounts. And EPA determined that that was, that cut off the causal chain. Now, we're not suggesting it needs to go as far as that. Ginsburg. What about the Fourth Circuit test? I take it you are advancing the Ninth Circuit value traceable test. But the Fourth Circuit test, which I'm not sure I comprehend it, is direct hydrological connection. What's the difference between those two? Justice Ginsburg, in our view, our test is narrower. Direct hydrological connection is the test that EPA and States had applied for three decades until EPA changed its position in April. And that looks mainly at the facts on the ground, the factual hydrologic connections. And so that would be the traceability I was discussing with the Chief Justice. We bound that factual causation. So even if there is causation in fact, the law, when you're looking at holding people responsible for what they caused, will not always hold them legally responsible if it's not foreseeable, if it's too attenuated, if it's too remote. Is there an example? I'm not sure I really see much of a distinction between the direct hydrological connection or a hydrological connection and what you're advocating. Let's take the example of a wastewater treatment facility. Can you think of any situation in which there is traceability? And I don't know what the difference is between fairly traceable and unfairly traceable, but put that aside. When it's traceable, but it wouldn't be foreseeable? No, Justice Alito. I think with a wastewater treatment plant, I would find it hard to think of a situation in which a wastewater treatment plant, which is designed to dispose of, not to store, but to dispose, in this case, of millions of gallons of treated sewage every day. When they designed this facility back in 1973, a decade before putting it into operation, they knew what they were doing. They drilled. This is not a case in which we have percolation down through the soil, eventually getting to groundwater. They drilled these injection wells directly into the groundwater expressly for the purpose of conveying it to the ocean. Okay. Well, that's this facility. Let's take an example of the ordinary family out in the country that has a septic tank, and they buy it from somebody who installs them, and they get the building permit that's required by that rural municipality. And then it turns out that some of — some things are leaching out of the septic tank 10 years later and making its way into waters of the United States. So they would be violating — they would be violating the Clean Water Act for lack of a permit and would be subject to all the penalties that go with that for every day of the violation. Well, Justice Alito, if I understand your hypothetical correctly, at the time that they purchased the house, they had no reason to believe that any pollutants would be getting to the ocean, and that would be a reasonable assumption for a homeowner, because septic tanks, as both, I think, the homeowners' brief — the National Homebuilders' brief, as well as Anderson County brief, point out, the reason that we have these types of regulations locally has nothing to do with the Clean Water Act. It's so that a septic tank is properly installed, and it's going to use the ground as a treatment system so that it doesn't even pollute groundwater, much less any — Well, what — I mean, what if they buy it from — and they don't have a lot of cost provider and the lowest cost installer, and then if it turns out, well, it should have been foreseeable that because you bought this from this cheap outfit that there was going to be a problem, that would be a violation? Well, fortunately, Justice Alito, it's a highly regulated thing, a septic tank. And so they not only need to get a purveyor, but they're going to have to follow the rules of the locality in the State. So I have personal experience with this, because I built a house and I — Could you just answer Justice Alito's question? I'd be grateful if you would. I mean, there are other regulations for non-point sources as well and for septic tanks. But under the foreseeability test or traceability test that you're proposing, why wouldn't the septic tank that foreseeably, objectively — it's not their personal, right? You don't want a subjective test. You want an objective test. Correct, Your Honor. So all that talk about what they personally think is irrelevant, why aren't they liable under your test? Well, Justice Gorsuch, if a reasonable person in the position of the homeowner would have no reason to believe the septic tank is going to get to navigable waters, the pollutants from the septic tank, they wouldn't be held liable. And in addition, the reason — Well, again, we're positing — I think you're fighting the hypothetical. One — you know, I'll give it one more shot. Oh. You know, that you've got great proof because water runs downhill and gravity tends to work its wonders with water and that the snow in the Rockies tends to wind up in the Mississippi River and that this septic tank happens to be built pretty close to a navigable river. And it was put in by a shoddy installer or whatever facts you have that are objective. Forget about the homeowner's subjective intentions. You're going to have a pretty good case. Let's posit hypothetically that it was foreseeable that this septic tank — and we might have put in San Francisco's green water treatment plants and a whole lot else — are foreseeable and they're going to wind up in the waters of the United States. What limiting principle do you have to offer the Court? Well, you also have the concept of traceability. So usually when you have one septic tank, you have more. And so just because you find pollutants in the water doesn't mean you know which one it's from. The definition of point source includes, as its first term, discernible. And so that's why the point source program focuses on whether you have a discernible point source. You're trying with this. You're trying with this. But look, I learned in the eighth grade, and it may be wrong, that water does run downhill and that virtually every little drop of rain that falls finds its way to the sea. And that's an overstatement, but not too much. So it's not just the septic tank. The miner gets up and every morning he throws his shaving water outside the house at Mount — at Pike's Peak. Okay? Now, there's a very good chance that that will end up in a river. And your brief, the brief of the scientists, really convinced me they're geniuses and they can trace all kinds of things. So the problem that I saw that I think we're all seeing with the traceability test is I've overstated it, but not by too much. And therefore, it puts all kinds of people in the position of having to get a permit. Have you ever tried to do that? That's a big, complicated thing. Okay? So we're looking, at least I am, for something not quite as broad as traceability, but something that doesn't run into the problems that you properly point out. So all kinds of things. I mean, that's why I put this functional equivalent of a direct discharge, which imposes some kind of limit on the EPA. They can write — this is for them. They should write rules. Okay? But traceability and causation, there we are, every little drop of rain. I mean, you know. Well, Justice Breyer, we believe that the way the statute is written, that traceability and proximate cause was a fair reading of the plain language of the statute. But the question presented to the Court is simply whether the mere fact that discharges that concededly are from a point source reach inavitable water through some distance of groundwater, whether that cuts off clean water liability. The answer to that is clearly no. Breyer. All right. Clearly no. But we have to write an opinion. And in writing the opinion, I think we're going to have to have a standard.  That's very important, the language. Yes. But I am worried about 500 million people or something suddenly discovering that they have to go apply for a permit for the EPA. Now, traceability and causation don't quite seem to do it. So I wonder if you have any sort of fallback position there that would cure my worry without getting into the evasion problems. Well, Justice Breyer, we could certainly embrace functional equivalent, because there's no question that Congress intended to regulate discharges whether it goes through the air. Now, everyone here agrees that the air is not a point source. But everyone also agrees if the point source discharges into the river through the air, it's covered. We in the United States agree that if it also flows over the land, which is also not covered by the Clean Water Act, it's covered. And I would submit that there's nothing in the language of the statute that exempts point source discharge just because it touches a little bit of groundwater. Congress could have done that. There are a number, as Justice Sotomayor mentioned, there are a number of enumerated exemptions in the Clean Water Act for things that would otherwise be point source discharges. So directly in the definition of point source, you exclude things like agricultural return – irrigation return flows and agricultural stormwater. Then you try to – I don't mean to be critical of the author of the phrase, but what does functional equivalent mean? And what do you understand it to mean? I mean, what we're looking – as for an equivalent, it's an equivalent to a point source, right? Right. Okay. I think of a pipe. Yes. Well, what's the functional equivalent of a pipe when you're talking about groundwater? Well, Mr. Chief Justice, in this case, when Petitioner was designing their wastewater treatment plant – and I should mention in Mikosuke this Court emphasized that municipal wastewater treatment plants is really what Congress was all about in enacting the law in 1972, when I also might add there was no Safe Drinking Water Act in 1972. Well, but that's a big windup. The question is what's the functional – what's a functional equivalent? When they were planning this, they thought about doing an ocean outfall, and they said, no, we can dispose of it just as well through injection wells. That's the functional equivalent. The question is, do you have an identifiable point source, and it's the same to the groundwater, over the ground, through the air, or directly into it, if the pollutants are getting into it, if there's an addition of pollutants, any addition of pollutants to the navigable water from an identifiable point source? Now, these very remote – I know it's – I understand it's not your – it sounds an awful lot like as vague as fairly traceable. If all of those things are the – it seems to me that your answer to me is that the functional equivalent is anything that gets to a jurisdictional water. Our – I mean, that's why we suggested as the test that it would be traceable, and so you would have causation in fact, and you would use principles of approximate cause, which this Court has embraced in other situations, like in the Endangered Species Act. It prohibits take of endangered species through habitat modification. Don't worry. He'll have an opportunity, because you didn't make this phrase up, and it's a little bit – and we do have – we do discuss these things. So we will discuss them. I was looking for something, which I'm not wedded to the one I said, but I'm looking for something that does give the EPA some leeway on this, but doesn't go as far as what traceability and causation do, which seem to say the sky's the limit. And that's what I'm looking for. Now, I think functional equivalent might or might not, but that's for a matter for us to discuss, I think. Your initial reaction was it's a little narrower, not too bad. I don't know what theirs is, but I'm not wedded to it. Well, Justice Breyer, I think ultimately the question before the Court, the question presented is whether or not mere passage through a little bit of groundwater cuts off clean water. Mr. Huck, maybe I don't understand the science of this, and perhaps like scientists can do everything. But wouldn't the question for these sort of septic tank examples be that your traceability requirement has to be that you look at the ocean and you find these pollutants in the ocean, and you have to say these pollutants came from a particular place. Could you say that as to a septic tank? No. In our view, Justice Kagan, you normally could not. I mean, if there's only one septic tank, if you're in an area where there's just one septic tank and you found fecal coliform or something that's indicative of a septic tank, you might be able to do that. But normally, when I built my house, everyone was on septic tanks because the sewer didn't go out to where we live. And that's normally the situation. So you couldn't say whether it's from your house or your house or your house or your house. Now, I suppose somebody could say, well, then you all have to get permits. Is that right? Is that the way you understand the traceability requirement? Not at all. Not at all. Not at all. So all you have to do is get a bunch of neighbors and all put the septic tanks in, and then you're scot-free? If you cannot determine which point source, if it's not an identifiable point source to control, so you don't know who's doing it, then that is archetypal non-point source pollution. Okay. So you're saying if it's one house, one septic tank, that person will need a permit. If it's a residential development and you have 100 septic tanks, which would seem to me to be 100 times worse, they don't need a permit. If you don't know which house might have a septic tank that was poorly installed, that didn't follow, you know, that didn't follow the rules or had some aberration geology such that it would be polluting the ocean, you don't know which one it was. I mean, I would think that that's an usual thing in law, right? Like, you can't hold somebody responsible for somebody or something unless you knew that they were responsible for that thing. Absolutely correct. And if there are 20 other people who could be responsible for that thing, then you can't hold them responsible for that thing, can you? That's absolutely correct. Now, here we don't have that problem. It's an Agatha Christie novel. You have 20 people and they all shoot the gun at the guy at the same time. They're all no one's guilty? That's court law, right? Maybe. I would be curious what counsel thinks about that. You have been asked in various forms. The question that was put in the reply brief on page 11 is, would you require permits for a toilet, an identifiable point source that originates wastewater and foreseeably sends it to the county's wells? So how would you answer that? Justice Ginsburg, we would not hold them responsible for a different reason. I think that Petitioner would hold them responsible because a toilet could be a point source. It goes into a pipe and it goes into a wastewater treatment plant that goes into a pipe and then it goes into an ocean outfall. That's point source to point source to point source and eventually they would hold the toilet flush reliable, perhaps under their theory. But fortunately, Congress in promulgating the Clean Water Act provides specifically for people flushing their toilet that if it goes to a wastewater treatment plant and it's not a hazardous waste that you're flushing down the toilet, there's no pretreatment standard and you don't need to get a permit. So that specific example, Congress dealt with. And that's an important part of the statute, which is Congress, when it wanted to exempt things from point source control, it carved out specific exceptions. Can I go back to your colloquy with the Chief Justice and Justice Kagan? Because it seems to me that's one of the contextual points that the other side points up here. You make a good argument about the word from in the text. The other side has its responses. And to figure out how to interpret that, one of the things they say we should look at is structure. And another thing is context. And on the context, the things they point out, and I want you to have a chance to respond, are this would be a massive increase in the permitting program, they say. The costs of permitting are high, they say. And I think you agree with that when you have to get a permit. And the uncertainty about when and whether you would need to get a permit, which I think is the colloquy you had with the Chief Justice and Justice Kagan, as well as transforming the federal-state balance. So those are the contextual points that they raise to help us figure out this interesting and difficult question about the text. And I'll give you a chance to respond to those contextual points, because that's what's bothering me. Okay. Justice Kavanaugh, with respect to the issue of whether it would be a massive expansion, the Court has benefits here from 30 years of experience. This is not a new test that was articulated by the Court below. But EPA for 30 years consistently said, and implementing states consistently followed, that discharges that reach navigable water via groundwater require a permit, and everyone under the sun has not required a permit. With respect to, I mean, they mentioned something like half a million injection wells. Well, injection wells, they're on that list from the EPA because they got a UIC permit, an injection-controlled permit. And in doing that, they had to look at the hydrology of the situation. And you'd know a lot about whether or not you were likely to pollute a navigable water. And cited particularly in the EPA official's brief, there is just a wealth of information there on permits that have been issued by EPA and states over these past 30 years for concentrated animal feeding operations, for wastewater treatment plants that's similar to theirs. Suppose I agree with you on this, just hypothetically, that EPA has been doing something like this, and so it wouldn't be a massive increase. So say I agree with you on that. Then I do think the uncertainty point is a big point for you to deal with, because you have to know in advance whether to get the permit or else you're going to be paying a huge amount at the back end. And so some clear line for the property owner, I think, is really important here. Well, in our perspective, specifically with individual homeowners and septic tanks, if you've installed your septic tank according to local ordinances and state regulation which are intended to protect groundwater, you know, much less navigable waters, if it's not polluting the groundwater, it's certainly not polluting the navigable waters. If you complied with that, if you maintain it properly, you have, objectively, you have no reason to believe that it's polluting the ocean. And so you would not have any foreseeability, any obligation to get a permit. In addition, if there was some average situation ---- You also don't want to be the subject of citizen suits. And so you would like that line not to be something that's objectively clear after a lot of litigation, but objectively clear on the front end. Understood. The Congress enacted the Citizen Suit provision at the same time as the Clean Water Act in 1972, and I'm not aware of any lawsuit against an individual septic tank owner for the violation notwithstanding, again, a consistent interpretation up until April of this year by the Environmental Protection Agency that discharges via groundwater are covered. And the reason for that is, in order to establish traceability and foreseeability and all that, you need a big discharger like the Petitioner here. You've got millions of gallons per day in an intentionally designed facility. Congress did not intend to create a loophole. I want to briefly address the United States' argument that there's something about the structure of the Act, something special about groundwater. Well, nearly every provision that they cite that talks about these programs for Congress treated them the same. And so in the same way that those provisions don't exempt surface waters, waters of the United States, they don't exempt groundwater. Alitoson The Court has spoken about hiding elephants in mouse holes. Was groundwater an elephant at the time when the Clean Water Act was enacted? And if it was, how do you account for the fact that there isn't any direct reference to it in the definition of a conveyance or any of the other provisions that are directly relevant here? Well, Justice Alito, there's no reference in any of the NPDES permitting program or the definition of a point source to regulating discharges via air. Yet Petitioner concedes if the pipe is hanging over the water's edge, it can pass through air. The United States concedes. I mean, do you think that that's really comparable, where you have a pipe that's over the river and the pollutant is coming out of the river and going through the air, that anybody's going to seriously argue that, well, because it went through the air, it wasn't covered? Do you really think that's comparable to groundwater that can travel a long distance? Well, Justice Alito, I can imagine a situation in which you have a pipe hanging out over the water and it's trickling into the water. And there's a strong wind. And every once in a while, the trickle gets batted upon the shore. So that's not covered because it's now on the shore. And then it's — then the wind dies down and it goes into the water. So there's really, you know, there's no difference in this situation. The same thing with respect to land. There's no reference to land in the NPDES permitting. And yet we can all conceive how it would create a road map for evasion if you can cut your pipe 5 feet short of the shoreline. Well, I don't know about that. If you have a pipe that stops short of the water, and you do that because you know that the pollutant, when it comes out of the pipe, is going to flow downhill into the river, I don't know that you're going to be able to avoid the conclusion that whatever it is that takes it down that slope is a conveyance. Well, a conveyance has to be confined in some way. So, for example, this wastewater treatment plant comes out at Kahikili Beach Park, which belongs to the county. So let's say instead they ran their discharge pipe to the beach park, they paved the land so it wouldn't create any furrow, any ditch, and in sheet flow it ran into the ocean. But they would say it's non-point source pollution because it stops short of the water's edge. Now, the United States would concede that that is covered. But if instead of doing that, they went to the beach park and they put a lot of gravel down, and they knew that it would run into the gravel and then, you know, go into the groundwater for like three inches before getting to the ocean itself because the ocean, if you've been to the beach, you dig in the sand, you get down to water pretty quickly. Well, that's groundwater unless and until it's on the surface and then it's the ocean. So under the United States theory, this pipe that then goes into the sand and then goes through a very small stretch of groundwater, that's all of a sudden exempted. So to use, you know, Mr. Stewart's example about the whiskey and the punch and the flask. And he said, you would never say the whiskey that's in the punch came from the bottle. You'd say it came from the flask. Well, here Congress was trying to prohibit whiskey in punch. So if all of a sudden you tasted the punch and you said, this tastes like whiskey, you'd say, where did that come from? You wouldn't point to, you'd say it came from the whiskey bottle. That's how we know it's whiskey. And here we know we have whiskey. Whiskey in the form of an injection well that is discharging three to five million gallons per day into the ocean. And there's nothing about the Clean Water Act that would allow a polluter to evade it by pouring the whiskey via the groundwater. Well, I didn't know Mr. Stewart was spiking punch. But would you say in his extent, to extend his example, that it came from a barrel in Scotland? Well, let's say the whiskey was spoiled in some way. And I'm not a whiskey drinker and I don't mean to offend any whiskey drinkers. But if the whiskey were spoiled some way, you might ask, where did this whiskey come from? And you might trace it back to the barrel in Scotland, particularly if it was poisonous or harmful in some way. So it all depends on the context. What Congress wanted to do here was regulate pollution at the source when we can. And the source here clearly is their injection well. But Congress knew about the groundwater issue. And there were debates about this precise groundwater issue. Maybe not this precise, but the groundwater issue. And there were proposals, as you're well aware, and some of the amicus briefs go through this at great length, to put in regulation of groundwater. And Congress rejected those. So how do we assess that in thinking about this? Well, Justice Kavanaugh, those debates quite clearly resulted in a vote that said, we are not going to enact national standards to control the quality of groundwater. So there is no regulation under the Clean Water Act of groundwater qua groundwater. And as I mentioned, in 1972, there was no ---- Your point is that's a separate topic from the issue today. Absolutely. In the same debates, they said, we recognize the essential link between ground and surface waters and the artificial nature of any distinction. If Congress had wanted to say point source discharge that reaches the navigable waters through groundwater is exempt because we want to leave that completely to the states, they would have said that in the language of the Act. They didn't. In the same way that they said we don't want point source discharges that could be characterized as agricultural stormwater or irrigation return flows. That usually happens in the form of a ditch. And they said, we do not want to regulate that under the point source program. But here what you have is paradigmatic point source pollution that just happens to pass through ---- Why are the ---- I'm sorry. Oh. Why are the states inadequate to do this? And are they inadequately regulating in substantial numbers of states, in your view? Well, I think the question, Justice Kavanaugh, is whether Congress intended to establish uniform ---- No. I understand your legal argument. But just as a practical question, what's happening on the ground in the states, are they doing an inadequate job in substantial numbers, in your view, of regulating this substantial source of pollution? Well, there are examples in the EPA officials' brief in which delegated states are regulating those sources of pollution by using the NPDES permit program. And as mentioned, Colorado pushed back against the mine owner that wanted to stop getting a permit by using the groundwater as a sewer to get pollutants into the waters. But ultimately what we have is a statement by Congress that you need to have uniform regulation to protect our national waters, which are a national concern. Thank you, counsel. Mr. Lynn, three minutes. Thank you, Mr. Chief Justice. I'd just like to pick up where my friend left off, which is with the example of the Colorado DEQ and the footnote in Maryland's brief. I think that is, as I thought I heard him say at the very end there, precisely an example of how the comprehensive regime works. The Colorado DEQ prohibited that mine from changing the way it was discharging pollutants in order to, to use Justice Breyer's word, evade its NPDES permit. I think that's a good point. 33 U.S.C. 1370, the Clean Water Act allows states to impose stricter requirements on NPDES permits. And, of course, there are Why are you doing what you're doing? This is fairly traceable to you in large quantities. The state didn't control you. What regulations are there in place that do? Your Honor, there are a number, starting with the No, no, no. You're doing it. What's stopping you from? This is not. So how did you get away with it? And how do you continue without taking remedial steps? Your Honor, I don't think this is a question Not you, but I mean Of course, Your Honor, I understand. I mean the polluters. What are they, what is being done to stop them? Well, Your Honor, I think if I can take issue with the premise there, which is that there's something that's being gotten away with here. These wells If they followed all the laws and they still are polluting, they're getting away with it. So something failed. The preventive measures of this law were not followed and something failed. Your Honor, the whole, even under NPDES permits, point source discharges can include pollutants that are below effluent limits. So I think the mere fact that there are nutrients that are getting into the ocean doesn't mean that the system has failed. And I think it comes back to the fact that in this particular circumstance, these wells were constructed with encouragement and funding from EPA as a more environmentally protective solution than simply constructing an outfall pipe to the ocean. If I can come back to the traceability point, I think it's also important to note, I mean, my friend runs very far away from the septic tank examples. And Justice Kagan, to answer your question about traceability, there are 7,000 cesspools within 750 feet of the ocean in Hawaii. And we cite to a study in our reply brief that showed that through a dye tracer study, not dissimilar from what was used here, it was established that pollutants from individual septic tanks were getting to the ocean within three hours to five days. So traceability can be done. Septic tanks are constructed near the ocean. And I don't think that there is a limiting principle that would give those landowners any certainty, which comes back to the point which I think is the most important about predictability. And, Justice Breyer, you had — Why don't you finish your thought? You had suggested functional equivalence. I think it's important to remember the context that we're talking about here. This is a permitting program that applies to ordinary laypeople and would require $50,000 a day in fines. We are looking at a statute and trying to figure out what Congress intended to write to give people that kind of predictability. Thank you, counsel. The case is submitted.